11-2201(L)
United States v. Taylor

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2013

Argued: February 4, 2013      Decided: December 4, 2013
Petition for Rehearing Filed: January 17, 2014
Decided: March 4, 2014

Docket Nos. 11-2201(L), 11-2426(CON), 11-2639(CON)

- - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

             Appellee,

        - v.-

CURTIS TAYLOR, ANTONIO ROSARIO, AKA Chickee, SAMUEL VASQUEZ,
AKA Rock,

             Defendants-Appellants.

- - - - - - - - - - - - - - - - - - - - -x


    Before:        KEARSE, JACOBS and CARNEY,
                   Circuit Judges.

    Curtis Taylor, Antonio Rosario, and Samuel Vasquez

appeal the judgments of the United States District Court for

the Southern District of New York (Marrero, J.), convicting

them of various charges related to a robbery of a pharmacy

in midtown Manhattan.  Because Taylor's post-arrest

statements were not voluntary, and were not properly

redacted, the convictions are VACATED, and the case is REMANDED for a new trial.

KELLEY J. SHARKEY, Brooklyn, New York, for Defendant-Appellant Curtis Taylor.

JILLIAN S. HARRINGTON, Monroe Township, New Jersey, for Defendant-Appellant Antonio Rosario.

COLLEEN P. CASSIDY, Federal Defenders of New York, Inc., New York, New York, for Defendant-Appellant Samuel Vasquez.

CHRISTOPHER D. FREY (Michael Bosworth, on the brief), Assistant United States Attorneys, for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

DENNIS JACOBS, Circuit Judge:

The United States petitions for rehearing following our decision in United States v. Taylor, 736 F.3d 661 (2d Cir. 2013). The petition is granted, and the opinion filed December 4, 2013 is withdrawn. For the reasons that follow in our revised opinion, we vacate the convictions of the three defendants and remand for a new trial.

Curtis Taylor, Antonio Rosario, and Samuel Vasquez appeal judgments of conviction entered in the United States

District Court for the Southern District of New York (Marrero, J.) for conspiring to commit Hobbs Act robbery and brandishing a firearm during a crime of violence, among other offenses related to the robbery of a pharmacy in midtown Manhattan. Taylor, who claims to have attempted suicide by pills as he was arrested, argues that he was incapacitated when he incriminated himself post-arrest, and that the court's decision to admit those statements into evidence violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the Due Process Clause of the Constitution. Rosario and Vasquez, who raise separate issues, join Taylor's challenge to the extent that Taylor's confession was used against them, and appeal the denial of their motion to sever on the ground that Taylor's statements caused prejudicial spillover and violated the confrontation right protected under Bruton v. United States, 391 U.S. 123 (1968).

This is a close case. But even assuming that Taylor's initial waiver of his Miranda rights was knowing and voluntary, Taylor was largely stupefied when he made his post-arrest statements, as confirmed by the testimony of the law enforcement agents and the pretrial services officer who

interviewed him, and by the evaluations of staff psychologists at the Metropolitan Correctional Center ("MCC"). The agents and officer testified that Taylor fell asleep repeatedly during questioning and was only intermittently alert. Although their testimony also suggests--and the district court found--that Taylor's incriminating statements were made in relatively lucid intervals, Taylor was impaired throughout, and his interrogators took undue advantage of that impairment by continuing to question him. We therefore conclude that Taylor's post-arrest statements were not voluntary. We further conclude that admitting those statements into evidence was not harmless. His conviction is therefore vacated and remanded for a new trial. And because Taylor's statements were redacted in a manner that left obvious indicia that the co-defendants' names had been deleted, their convictions are also vacated and remanded for a new trial.

**I**

On Christmas Eve 2008, Vasquez drove Taylor and Rosario from the Bronx to midtown Manhattan to rob a pharmacy. With them was Luana Miller, a drug addict from Mississippi with an extensive criminal history.

4

En route, Miller called the pharmacy and asked them to stay open for a few minutes past 5:00 PM, so that she could pick up a prescription. At the pharmacy, Miller went in first, posing as a customer. As she spoke with the pharmacist, Rosario burst in the door brandishing a gun, screaming that it was a robbery, and demanding OxyContin: a powerful opioid for pain that is often resold illegally. The two took more than $12,000 of controlled substances, as well as cash and subway cards, while Taylor stood lookout at the front door and Vasquez waited in the getaway car. The crew then drove back to the Bronx. Cell phone records for Taylor, Rosario, and Vasquez show that they were in the Bronx that afternoon, traveled to midtown Manhattan just before 5:00 PM, stayed near the pharmacy until just after the robbery, and then returned to the Bronx.

While executing a warrant at the home of Miller's boyfriend in January 2009, police arrested her on outstanding warrants. Fearing extradition to Mississippi, she offered to cooperate with the government's investigation of the pharmacy robbery, and led police to Taylor, Rosario, and Vasquez.

Around 6:00 AM on April 9, 2009, over 25 NYPD and FBI agents came to Taylor's apartment to effect his arrest.

Taylor claims that, amid the ensuing chaos, he attempted suicide by taking a bottle-full of Xanax pills. Taylor's daughter testified that her mother (who died before trial) reported the overdose to an officer who dismissed her and told her to "shut up." Still, the record is less than clear as to whether Taylor actually took the pills, and as to whether officers were told of his overdose.

Around 9:30 that morning, Taylor was interviewed at FBI headquarters in downtown Manhattan by New York City Police Department Detective Ralph Burch, a member of an FBI/New York health care fraud task force. Taylor signed a form waiving his <u>Miranda</u> rights, and went on to give a lengthy statement confessing his involvement in the robbery.

Taylor argues that he was falling asleep and was at times unconscious during the interview. Detective Burch said that it seemed like Taylor's body was "somewhat shutting down" during the two- to three-hour interview. Supplemental App. 51. On the other hand, Burch testified that, though Taylor nodded off at times, he was "coherent" and "fluid" when he was awake and speaking:

> Mr. Taylor at times was nodding off during the interview. When we asked Mr. Taylor to listen up, that we were asking him questions, he would respond that he knew what he was being asked and he would repeat the questions back to us to show

6

that he was understanding what was being asked of him and knew what was going on.

Id. at 45. Detective Burch clarified that Taylor did not need to be awakened during the interview; he just had to be "refocused." Id. at 46. "He seemed like he was dozing off, and we had to stress did he understand what was going on. . . . [I]t was my impression that he knew what was going on then." Id.

Taylor was later taken to a hospital for medical clearance before his transfer into the custody of the Marshals Service. FBI Special Agent Ian Tomas, who was also involved in the interrogation, explained that Taylor was taken to the hospital because "[t]here was some talk about him on some medication and possibly an injury he had sustained previous at a construction site." Id. at 137. Agent Tomas clarified that the hospital visit was necessary because there was some question as to whether the Marshals Service would take custody of someone who "might be off": "We felt that his do[z]ing off might be a reason the marshals wouldn't accept the custody of Mr. Taylor." Id. at 160. Taylor spent the rest of the day at the hospital sleeping, but he did not receive medical attention. He was transferred to the MCC later that evening.

The next morning, April 10, Taylor met with MCC staff psychologists. The MCC's chief psychologist, Dr. Elissa Miller, explained that they wanted to evaluate Taylor before his arraignment because they knew of Taylor's earlier schizophrenia diagnosis and several prior attempts at suicide. According to Dr. Miller (who reported on findings by staff psychologists), Taylor "presented with a thought disorder," drooled, was vague, stared blankly, and "[h]is thoughts lacked spontaneity." Id. at 110. Miller testified that "if you asked him questions, he really couldn't elaborate on them because his thought process was impaired." Id. at 111.

Taylor also told one of the staff psychologists that "the day he was arrested by the FBI, he took multiple Xanax pills in an attempt to kill himself because he had promised himself that he would never go back to jail." Id. at 113. Taylor told Miller that, "[a]s a result of taking all those Xanax pills, he . . . wasn't waking up and he went to the hospital." Id.

He was then taken to the courthouse for arraignment. While awaiting arrival of a pretrial services officer, Taylor told Agent Tomas that "he wanted to clear up some issues about the charges that he was presented with." Id.

8

at 139.  Agent Tomas took Taylor to an interview room and again advised him of his <u>Miranda</u> rights; Taylor confessed to the robbery again.

Around 12:30 PM that day, Taylor met with Dennis Khilkevich, a pretrial services officer.  Khilkevich testified that when he arrived for the interview, Taylor "appeared sleepy and had to be awakened to be interviewed." <u>Id.</u> at 319.  "He was sitting in a chair and he appeared as if he was asleep or he was taking a nap." <u>Id.</u>  Khilkevich stopped the interview because Taylor "repeatedly fell asleep in the chair." <u>Id.</u> at 320.  When the interview resumed, Taylor "was initially responsive maybe for several minutes," but "[t]hen he continued to fall asleep." <u>Id.</u>  "He had to be woken up and he would be responsive for a few minutes and then he would go to sleep again." <u>Id.</u>  Khilkevich eventually finished the interview, explaining that Taylor was awake and coherent "[a]t times." <u>Id.</u> at 323.

As to the other defendants:

- Rosario was also arrested on April 9, 2009, and waived his <u>Miranda</u> rights.  He claimed at first that he was in the hospital the day of the robbery, but then said he had actually been at his girlfriend's house in Queens.  When told that a

surveillance video showed a suspect like him, Rosario laughed and ambiguously said "yeah." Trial Transcript ("Tr.") 571.

- Vasquez was arrested a day earlier, on April 8, after surveillance linked him to the car believed to have been used in the pharmacy robbery. When arrested, he was carrying car keys, a cell phone, and a piece of paper listing various milligram doses of oxycodone and OxyContin, along with the number of pills of each dose. Vasquez gave no statement to police.

The indictment charged the three with (1) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(b)(1); (2) Hobbs Act robbery; and (3) use, possession, and brandishing of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Taylor was additionally charged with (4) fraudulent acquisition of controlled substances by passing forged prescriptions, in violation of 21 U.S.C. § 843(a)(3).

Taylor moved to suppress his two post-arrest statements on the ground that his Miranda waivers and his post-arrest statements were neither knowing nor voluntary. The testimony summarized above was given at the suppression

10

hearing (starting April 23, 2010, continuing May 4, 2010, and concluding May 6, 2010). The district court denied suppression of Taylor's post-arrest statements, finding that the government sustained its burden of proving that Taylor's <u>Miranda</u> waivers were "informed and voluntary." Supplemental App. 385. The court found that the testimony of the law enforcement agents was consistent, corroborated, and truthful. <u>Id.</u> at 386-87.

The court rejected the argument that Taylor's incapacitation rendered his post-arrest statements involuntary:

> [T]he defense does not allege that the government failed to read Mr. Taylor [his] rights before questioning began or any other coercion. Even were the Court to assume that Mr. Taylor ingested a large quantity of Xanax shortly before his arrest, the Court credits the testimony from the government's witnesses that Mr. Taylor was sufficiently lucid during the questioning that his waiver of <u>Miranda</u> rights was knowing and voluntary.
>
> The fact that there is evidence that Mr. Taylor nodded off from time to time during the questioning does not persuade the Court that during those portions of the testimony when he was awake and lucid he could not have voluntarily and knowingly waived his <u>Miranda</u> rights.

<u>Id.</u> at 387-88. The district court went on to explain that it did "not equate nodding off intermittently with total psychotic episodes of hallucination and other extreme

11

circumstances that might throw greater doubt on the defendant's ability to voluntarily and knowingly waive his rights." Id. at 388.

Taylor's statements, which implicated Rosario and Vasquez, were redacted at trial to remove their names. The jury was instructed that Taylor's statements should be considered only as to Taylor.

In December 2010, the jury convicted on all counts. Taylor was sentenced principally to 200 months' imprisonment, Rosario was sentenced principally to 180 months, and Vasquez was sentenced principally to 170 months. They all filed timely notices of appeal.

**II**

The main issue on appeal is whether Taylor's Miranda waivers on April 9 and April 10, and his post-arrest statements on each of those dates, were knowing and voluntary. "We review a district court's determination regarding the constitutionality of a Miranda waiver de novo and a district court's underlying factual findings for clear error." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007).

12

A statement made by the accused "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). "The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made." In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 211-12 (2d Cir. 2008); see also Dickerson v. United States, 530 U.S. 428, 444 (2000) ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.").

We look at the totality of circumstances surrounding a Miranda waiver and any subsequent statements to determine knowledge and voluntariness. See Oregon v. Elstad, 470 U.S. 298, 309 (1985). In that context, "knowing" means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and "voluntary" means by deliberate choice free from intimidation, coercion, or deception. United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011), cert. denied, 132 S. Ct. 1610 (2012). The

13

government bears the burden of proof.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).

The analysis applicable to April 9 differs somewhat from the analysis applicable to April 10.

**April 9**.  In general, a suspect who reads, acknowledges, and signs an "advice of rights" form before making a statement has knowingly and voluntarily waived <u>Miranda</u> rights.  <u>See</u> <u>Plugh</u>, 648 F.3d at 127-28.  Before making his April 9 statement, Taylor was given <u>Miranda</u> rights using an "advice of rights" form.  He was read every right, voiced his understanding, and signed the form.  At the time, according to Detective Burch, Taylor had a "fluid" demeanor, "knew what was going on," and "understood what was happening."  Supplemental App. 15.  This evidence, credited by the district court, supports the conclusion that Taylor knowingly and voluntarily waived his <u>Miranda</u> rights before speaking with law enforcement on April 9.

But even accepting that Taylor's April 9 <u>Miranda</u> waiver was knowing and voluntary, we must nonetheless determine whether the inculpatory statements themselves were voluntary.  <u>Dickerson</u>, 530 U.S. at 444.  "A confession is

14

not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). The voluntariness inquiry should examine "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." Id. An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual. Connelly, 479 U.S. at 164-65; see also United States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998) (per curiam).

The record indicates that Taylor's April 9 statement was made when he was unable to summon the will to make a knowing and voluntary decision; his will was overborne.

It is difficult to determine whether a confession is voluntary; case law "yield[s] no talismanic definition" for the term. Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973). It is clear, however, that when "a person is unconscious or drugged or otherwise lacks capacity for conscious choice," a confession cannot be voluntary. Id. (internal quotation marks omitted); see also United States

15

ex rel. Burns v. LaVallee, 436 F.2d 1352, 1355-56 (2d Cir. 1970) (holding a written confession to be involuntary when given "after over eighteen hours of uninterrupted custodial interrogation, after he had been without sleep, and almost without food, for thirty hours").

Taylor claims he was mentally incapacitated during the April 9 interview because of the quantity of Xanax pills he ingested immediately before his arrest. That claim finds support in the record. Detective Burch testified that Taylor's body "was somewhat shutting down," and that "at that time that he was answering questions . . . his body was giving up on him." Supplemental App. 51. The district court credited this testimony. Granted, Burch also testified that, when Taylor was speaking, he was "coherent" and understood what was going on when he was not nodding off. Id. But it nonetheless appears that Taylor fell asleep at least two or three times during the interview, and the officers repeatedly had to awaken him, or (to use the nicer term) "refocus" him--at one point coaxing him, "Mr. Taylor, you have to answer our questions and focus with us." Id. at 47. Agent Tomas corroborated that Taylor was "a little bit out of it" and dozing off. Id. at 158-61.

16

In Mincey v. Arizona, 437 U.S. 385 (1978), statements by a defendant who was hospitalized were ruled involuntary. The Court observed that the defendant was in intensive care for a serious wound and was "evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation." Id. at 398. The statements were "the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." Id. at 401; see also id. ("But despite [the accused's] entreaties to be let alone, [the police officer] ceased the interrogation only during intervals when [the accused] lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task.").

On the other hand, in Salameh, we rejected a claim that a statement was involuntary, even though the accused claimed that prior to being taken into U.S. custody, he had been incarcerated in Egypt and tortured for ten days. 152 F.3d at 117. Despite the accused's weakened mental state, his statements were voluntary because he did "not contend that federal agents either mentally or physically coerced his remarks during that interrogation." Id.; see also Plugh,

17

648 F.3d at 128 (statements voluntary because defendant "was never threatened physically or psychologically abused in any manner, or made any type of promises such that his will was overborne") (internal quotation marks omitted).

One difference between Mincey and Salameh is the presence in Mincey of police overreaching, see Connelly, 479 U.S. at 157 (stressing the "crucial element of police overreaching" in assessing voluntariness), and that is no doubt a difficult issue here. Continued questioning of a sleep-deprived suspect can be coercive, depending on the circumstances, see, e.g., Mincey, 437 U.S. at 401; LaVallee, 436 F.2d at 1355-56; but the decisive issue is whether the will was "overborne" by the police, so that the defendant is not using such faculties as he has. The conditions in which Taylor was questioned do not appear to have been abusive;[1] but there is little difference in effect between sleep deprivation as a technique and the relentless questioning of a person who is obviously unable to focus or stay awake for some other reason.

---

[1] The law enforcement agents, though persistent in interrogating Taylor and summoning him to alertness as he continued to fall asleep, do not appear to have acted maliciously or abusively during the interrogation.

18

The district court credited testimony that Taylor was coherent *at times*. One such interval is when Taylor signed the "advice of rights" form on April 9, a finding that we do not disturb. But as that interview progressed, it became clear to the officers (as their testimony confirms) that Taylor was in and out of consciousness while giving his statement, and in a trance or a stupor most of the time when not actually asleep. Thus, the officers' persistent questioning took undue advantage of Taylor's diminished mental state, and ultimately overbore his will. Accordingly, we conclude that Taylor's statement on April 9 was not voluntary and should have been suppressed.

**April 10**. On the morning of April 10, Taylor himself initiated contact with law enforcement by notifying Agent Tomas that "he wanted to clear up some issues about the charges that he was presented with." Supplemental App. 139. He was then orally re-advised of his rights, orally waived them, and gave an additional statement, altering some aspects of his April 9 account. Although Taylor continued to slip in and out of consciousness that day, Agent Tomas testified that, when Taylor spoke to the agents mid-morning,

19

he was "much more alert" than he had been the day before.[2] Id. at 139-42. But because Taylor's first confession on April 9 was the product of coercion, we must determine whether his second waiver and confession, less than twenty-four hours later, were rendered involuntary based, at least in part, on the "taint clinging to the first confession." Anderson, 929 F.2d at 102.

"[T]he use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered Miranda warnings." Tankleff v. Senkowski, 135 F.3d 235, 245 (2d Cir. 1998) (internal quotation marks omitted). That is so because, "after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed." United States v. Bayer, 331 U.S. 532, 540 (1947).

"In deciding whether a second confession has been tainted by the prior coerced statement, 'the time that passes between confessions, the change in place of

---

[2] As discussed further below, it is not at all clear that Taylor was appreciably more alert.

interrogations, and the change in identity of interrogators all bear on whether that coercion has carried over into the second confession.'" Anderson, 929 F.2d at 102 (quoting Elstad, 470 U.S. at 310). Less than a day passed between Taylor's first and second confessions, and in that interval, Taylor was hospitalized or unconscious most of the time. Although the venue of the interrogations differed, Agent Tomas was present at both--and it was to Agent Tomas that Taylor addressed his request to "clear up some issues." The taint of the prior involuntary confession carried over to Taylor's second waiver and statement, burdening both with a "presumption of compulsion." Tankleff, 135 F.3d at 245.

That presumption is reinforced by uncontradicted testimony regarding Taylor's lingering mental incapacity on April 10. Taylor continued to doze off that morning and was alert only "at times." Supplemental App. 162. Just before the April 10 interview, FBI Special Agent Steven Jensen saw Taylor "slouched in his chair, and he appeared to be sleeping." Id. at 247. When asked for how long Taylor was asleep, Agent Jensen explained (ambiguously) that it was "in excess of minutes." Id.

21

Although the record does not suggest that Taylor fell asleep during the April 10 interview, there is evidence that, throughout the day on April 10, Taylor remained in a fog. Dr. Miller reported that Taylor was mentally impaired on the morning of April 10 and could not adequately respond to questions:

> When he was seen, he presented with a thought disorder. He was noted to be picking at his nails. He was drooling. He was vague in his responses to questioning. He presented with what we call a flat affect . . . just kind of flat and blank-face stare.
>
> He could not elaborate on questions asked. His thoughts lacked spontaneity. His speech was vague. When we would ask him certain questions about whether he was hearing voices, he couldn't really elaborate on his responses.

Id. at 110. Dr. Miller also reported the observation made by psychologists in her division: "[I]f you asked him questions, he really couldn't elaborate on them because his thought process was impaired." Id. at 111.

Dennis Khilkevich, a pretrial services officer who interviewed Taylor at around 12:30 PM on April 10, found Taylor drowsy and in need of rousing. See id. at 319 ("He was sitting in a chair and he appeared as if he was asleep or taking a nap."). When Khilkevich tired of waking him up, he suspended the interview; and when he resumed, Taylor

22

continued to fall asleep between short intervals of consciousness, so Khilkevich ended the questioning.

The district court did not discredit the testimony of Dr. Miller or Khilkevich.

Evidence of Taylor's continued incapacity on April 10, coupled with the taint of his prior confession, renders his second waiver and statement involuntary. Considering the totality of circumstances, we conclude that Taylor's inculpatory statement on April 10 should have been suppressed.[3]

**III**

Next we consider whether the error in admitting those statements was harmless. Arizona v. Fulminante, 499 U.S. 279, 310-11 (1991) (Rehnquist, C.J., writing for a majority as to harmless error analysis); see also Zappulla v. New York, 391 F.3d 462, 466 (2d Cir. 2004). "When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other

---

[3] When it appears that a defendant is malingering, the calculus should be vastly different. Here, all the witnesses support the account that Taylor was actually slipping in and out of consciousness during the April 9 interview, and immediately before and after the April 10 interview.

23

forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless *beyond a reasonable doubt*." Fulminante, 499 U.S. at 310 (emphasis added).

"Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Neder v. United States, 527 U.S. 1, 18 (1999). "[T]he court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact," Fulminante, 499 U.S. at 313 (Kennedy, J., concurring); "it may be devastating to a defendant," Id. at 312 (Rehnquist, C.J., writing for a majority as to harmless error analysis). The following (nonexclusive) factors bear on whether the erroneous admission of a confession was harmless: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." Zappulla, 391 F.3d at 468.

The admission of Taylor's involuntary confessions was not harmless error beyond a reasonable doubt. (1) Taylor's

24

confessions were a critical part of the prosecution's case. The case against Taylor otherwise rested on the testimony of Luana Miller and cell-site records. Miller's testimony was subject to attack, as Taylor claims, because of her criminal past and because she had much to gain from cooperating with the government. Further, while the cell-site records corroborate Miller's account of their movements, no other witness or physical evidence links Taylor to the crime. (2) The prosecution emphasized Taylor's confessions throughout trial, including at opening and closing, and had both statements read to the jury in full. (3) & (4) Taylor's confessions were important to the case, corroborating Miller's critical testimony. Further, a confession is recognized to have greater impact than the same testimony given by another witness. See, e.g., Fulminante, 499 U.S. at 312-13. Given the weight that a jury may accord a confession, as well as the other relevant factors, the admission of Taylor's post-arrest statements was not harmless.

In sum, Taylor confessed while in a stupor, his will was overborne, his statements were not voluntarily made, and they should have been suppressed. Considering the other evidence against Taylor and the important role that his

25

confessions played at trial, this was not harmless error. We therefore vacate Taylor's conviction and remand for a new trial.[4]

**IV**

Rosario and Vasquez argue that the admission of Taylor's post-arrest statements violated their rights under the Confrontation Clause because they had no opportunity to cross-examine Taylor and because his statements pointed to them.

It matters that the district court gave limiting instructions. The court instructed that "[s]ome evidence is admitted for a limited purpose only," and pointed specifically to "certain statements that law enforcement agents testified were made to them by Mr. Taylor and Mr. Rosario and that were admitted only as to the particular defendant who made the statement." Vasquez App. 220. The court later reinforced that instruction:

---

[4] Aside from Counts One, Two, and Three of the indictment, which stemmed from the pharmacy robbery (of which all three defendants were convicted), Taylor was also convicted of making a misrepresentation to obtain OxyContin (Count Four). The government relied heavily on Taylor's confession in proving this offense. Accordingly, we vacate all of Taylor's counts of conviction, under the same harmless error analysis.

26

As I instructed you previously, evidence of statements that law enforcement agents testified were made by a particular defendant was admitted with respect to that particular defendant alone, and if you find that the statements were made, may not be considered or discussed by you in any way with respect to any other defendant when you begin your deliberations.

Id. at 227; see also id. at 177 ("The evidence of alleged statements made by Curtis Taylor to law enforcement is admitted with respect to Curtis Taylor alone and may not be considered or discussed by you in any way with respect to either of the other defendants . . . .").

We normally assume that jurors follow limiting instructions. See, e.g., United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009). But a confession by one co-defendant in a joint trial poses substantial risk for the other co-defendants notwithstanding such an instruction. See Bruton v. United States, 391 U.S. 123, 135-36 (1968). In Bruton, the Supreme Court recognized the risks posed by "powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant," which are then "deliberately spread before the jury in a joint trial." Id. Such limiting instructions call for "a mental gymnastic which is beyond, not only [the jury's] powers, but anybody's else." Nash v. United States, 54 F.2d 1006, 1007

27

(2d Cir. 1932) (L. Hand, J.).  The risk is heightened when the circumstances deprive a defendant of the constitutional right to confront the witnesses against him.  See Gray v. Maryland, 523 U.S. 185, 196 (1998).

"The crux of [the Confrontation Clause] is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination."  Jass, 569 F.3d at 55 (internal quotation marks omitted).  When the confession of one defendant implicates his co-defendants, Bruton demands "a redaction and substitution adequate to remove the 'overwhelming probability' that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant."  Id. at 60.  Accordingly, "redacted confessions 'that simply replace a name with . . . *obvious indications of alteration*' fall within Bruton because they 'refer[ ] directly to the "existence" of the nonconfessing defendant.'"  Id. at 58 (quoting Gray, 523 U.S. at 192) (emphasis in original).

Redactions and substitutions can avoid Bruton error if the altered statement uses words "that might actually have been said by a person admitting his own culpability in the

28

charged conspiracy while shielding the specific identity of his confederate." Id. at 62. Along these lines, we have previously allowed proper names to be replaced with the following terms (among others): "another person," id. at 59; "others," "other people," and "another person," United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989); the pronoun "he," United States v. Kyles, 40 F.3d 519, 526 (2d Cir. 1994); "this guy," "another guy," and "similar language," United States v. Williams, 936 F.2d 698, 699, 701 (2d Cir. 1991); and "friend," United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir. 1990). We explicitly left open, however, "the possibility of a neutral-word substitution being so conspicuously awkward" that the alteration becomes obvious. Jass, 569 F.3d at 61; see also Tutino, 883 F.2d at 1135 (upholding redacted statement where "the jury never knew that [the declarant's] original statement named names").

The redactions here suggest that Taylor's original statements contained actual names. Throughout, Luana Miller's name is used--without redaction--conjoined with reference to persons who are unnamed: "LUANA MILLER and two other individuals"; "The person waiting with LUANA MILLER and TAYLOR"; and "TAYLOR, LUANA MILLER, and the driver." If

29

Taylor had been trying to avoid naming his confederates, he would not have identified one of them--Miller--in the very phrase in which the names of the other confederates are omitted.[5]  The jurors would notice that Miller is the one person involved who was cooperating, and would infer that the obvious purpose of the meticulously crafted partial redaction was to corroborate Miller's testimony against the rest of the group, not to shield confederates.

Moreover, the wording of the statement suffers from stilted circumlocutions: "The robbery was the idea of the person who waited with Luana Miller and Taylor at the gas station"; "Luana Miller and the other person who had waited with Taylor at the gas station came up with the plan"; "[A]ll four of them went to the house of the mother of one of the other individuals."  And reference to "two other individuals" is suspiciously closer to the speech of a prosecutor than that of a perpetrator.

In Jass, we suggested that the following redaction would be inadequate: "When I realized the guard had pulled the alarm, I turned and said to another person, 'Look, other

_____

[5] There was no evidence Taylor knew of Miller's cooperation at the time of his arrest; Miller did not sign a formal cooperation agreement with the government until months later.

30

person, we have to get out of here.'"  569 F.3d at 62.
Taylor's redacted statement betrays a similar flaw in
referencing Vasquez, who drove the car: "the driver was
running late.  When the driver got there, he drove the three
of them"; "The driver then drove the car back to the Bronx."
These sentences reflect a mechanical substitution of the
driver's role for the driver's name.

Once it becomes obvious that names have been pruned
from the text, the choice of implied identity is narrow.
The unnamed persons correspond by number (two) and by role
to the pair of co-defendants.  This "obviously redacted
confession . . . points directly to the defendant[s], and it
accuses the defendant[s] in a manner similar to . . . a
testifying codefendant's accusatory finger."  Gray, 523 U.S.
at 194.  The jury could immediately infer, on the evidence
of the redacted confession alone, that Taylor had likely
named the co-defendants.  See Jass, 569 F.3d at 57 ("The
inferences . . . involve statements that, despite redaction,
obviously refer directly to someone, often obviously the
defendant, and which involve inferences that a jury
ordinarily could make immediately, even were the confession
the very first item introduced at trial." (quoting Gray, 523
U.S. at 196)).

31

*Jass* does not require the most natural and colloquial rendering of how a drug thief would have shielded the identity of his confederates.  But the awkward circumlocution used to reference other participants, coupled with the overt naming of Luana Miller (only), is so unnatural, suggestive, and conspicuous as to offend *Bruton*, *Gray*, and *Jass*.[6]

# V

Rosario and Vasquez also argue that the admission of Taylor's post-arrest statements caused prejudicial spillover.[7]  Because we vacate the convictions of Rosario

---

[6] After briefing and oral argument in this appeal, Taylor and Vasquez sought to raise an issue recently addressed by the Supreme Court in *Alleyne v. United States*, 133 S. Ct. 2151 (June 17, 2013): whether their "brandish[ing]" of a firearm in connection with a crime of violence--an element of the offense increasing the mandatory minimum sentence--was found by the jury beyond a reasonable doubt.  Although we need not reach this issue (because we vacate their convictions on other grounds), the challenge has no merit; the jury did make the necessary finding.  *See, e.g.*, Verdict Form 5; Tr. 1194.

[7] Vasquez raises two other arguments on appeal that may have some bearing on the proceedings upon remand.  First, Vasquez argues that the district court erred by limiting his cross-examination of Miller on the circumstances surrounding Rosario's possession of a gun.  Second, Vasquez argues that the district court delivered an unbalanced jury instruction on the significance of the ledger found in his pocket after his arrest.  We see no abuse of discretion on either score.

and Vasquez on other grounds, we need not reach this claim.[8]

## CONCLUSION

For the foregoing reasons, we vacate the convictions and remand for a new trial.

---

[8] It may matter on remand that Rosario's challenge to the admissibility of Miller's testimony under Rule 404(b) is without merit. Miller's testimony about plans to commit a pharmacy robbery related to the crime charged in this case, and the district court did not abuse its discretion by admitting that evidence as relevant background. See United States v. Greer, 631 F.3d 608, 614 (2d Cir. 2011).