15-958-cr (L)
*United States v. Lyle & Van Praagh*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2016

(Argued:     January 12, 2017        Decided:     May 9, 2017)

Docket Nos. 15-958-cr(L), 15-1175-cr(CON)

UNITED STATES OF AMERICA,

*Appellee,*

v.

JAMES LYLE, AKA SEALED DEFENDANT 3, MICHAEL VAN PRAAGH, AKA SEALED
DEFENDANT 1,

*Defendants-Appellants,*

ANTHONY TARANTINO, AKA SEALED DEFENDANT 2,

*Defendant.*\*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

\*     The Clerk of Court is respectfully directed to amend the official caption to
conform to the above.

Before:

RAGGI, CHIN, AND LOHIER, *Circuit Judges*.

---

Consolidated appeals from judgments of the United States District Court for the Southern District of New York (Crotty, *J.*) entered after defendants-appellants James Lyle and Michael Van Praagh were convicted at trial of charges relating to drug trafficking. Lyle challenges the admission of (1) physical evidence obtained pursuant to warrantless searches and (2) his post-arrest and proffer statements. Van Praagh challenges (1) the sufficiency of the evidence of conspiracy, (2) the admission of Lyle's post-arrest and proffer statements in their joint trial, and (3) the reasonableness of his sentence.

AFFIRMED.

---

MICHAEL FERRARA, Assistant United States Attorney (Brendan F. Quigley, Assistant United States Attorney, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

DANIEL S. NOOTER (Thomas H. Nooter, *on the brief*), Freeman Nooter & Ginsberg, New York, New York, *for Defendant-Appellant James Lyle*.

2

MARSHA R. TAUBENHAUS, Law Offices of Marsha R. Taubenhaus, New York, New York, *for Defendant-Appellant Michael Van Praagh.*

---

CHIN, *Circuit Judge*:

Defendants-appellants James Lyle and Michael Van Praagh appeal from judgments of the United States District Court for the Southern District of New York (Crotty, *J.*) convicting them on charges relating to the distribution of methamphetamine. Lyle challenges the admission at trial of evidence seized during a December 11, 2013 inventory search of a rental car and a January 9, 2014 search of his hotel room. He also challenges the admission at trial of certain post-arrest and proffer statements. Van Praagh challenges the sufficiency of the evidence of his participation in a methamphetamine distribution conspiracy, the admission of Lyle's post-arrest and proffer statements in their joint trial, and the reasonableness of his sentence. Because we conclude that the evidence at trial was sufficient to support all convictions, the challenged searches and seizures did not violate the Fourth Amendment, the admission of Lyle's statements did not violate the Fifth Amendment, and Van Praagh's sentence was reasonable, we affirm the judgments of the district court.

3

## BACKGROUND

**I.     *The Facts***

Because Van Praagh and Lyle appeal convictions following a jury trial, we view the evidence in "the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016) (quoting *United States v. Dhinsa*, 243 F.3d 635, 643 (2d Cir. 2001)).

**A.     *Overview***

Throughout 2013, Van Praagh regularly sold pound quantities of methamphetamine. These deals generally occurred once a week and often took place in Manhattan hotels. Van Praagh also sold smaller quantities of methamphetamine out of his apartment in Queens and through in-person deliveries to his customers. Brandon Hodges, an Arizona-based methamphetamine supplier, sent Van Praagh methamphetamine on three or four occasions during this time, with the largest shipment containing four ounces of methamphetamine. Van Praagh regularly sold methamphetamine to Lyle, who was also a methamphetamine dealer in the New York area. Lyle regularly sold methamphetamine to Anthony Tarantino. Tarantino initially purchased

4

methamphetamine for personal use, but eventually starting selling small quantities of methamphetamine to his own clients. Both Hodges and Tarantino cooperated with the government and testified at trial.

In January 2013, Lyle introduced Tarantino to Van Praagh. Tarantino accompanied Lyle to Van Praagh's apartment so that Lyle could restock his methamphetamine supply. While at Van Praagh's apartment, Tarantino saw Lyle purchase methamphetamine from Van Praagh, which Lyle later sold to Tarantino. In April 2013, Lyle took Tarantino to Van Praagh's apartment a second time, where Tarantino again observed Lyle "re-up," *i.e.*, purchase methamphetamine, from Van Praagh. After this second visit, Tarantino and Van Praagh became romantically involved, and eventually Tarantino moved in with Van Praagh and began helping him sell methamphetamine.

**B.** *The Seizure of Methamphetamine from Van Praagh's Hotel Room*

On May 29, 2013, Van Praagh and Tarantino checked into the Out Hotel in midtown Manhattan. That night, they sold pound quantities of methamphetamine to several customers, including Lyle. The next day, they checked out of the hotel but accidentally left approximately a pound of

5

methamphetamine and $20,000 cash in the hotel room safe. Hotel staff found the drugs and money and called the New York City Police Department ("NYPD"), and officers arrived to seize the drugs and cash. After Van Praagh realized his mistake later that day, he returned to the hotel, where he was arrested by the NYPD. During the arrest, the officers seized a cellular phone and over $1,000 cash from Van Praagh's pocket. The officers also searched Van Praagh's Vespa scooter parked outside the hotel, where they found part of and packaging for a digital scale.

Soon thereafter, Tarantino brought Lyle money to give to Van Praagh's father to bail Van Praagh out of jail. The day after Van Praagh got out of jail, he and Tarantino flew to Arizona to ensure that Van Praagh's methamphetamine suppliers would continue to sell to him. Van Praagh and Tarantino returned to New York and continued their sale of methamphetamine.

C.    *Lyle's Arrests*

On December 11, 2013, NYPD officers observed Lyle park and exit a car in midtown Manhattan. The officers noticed a knife clipped to Lyle's pants, which they later determined to be an illegal gravity knife. The officers approached Lyle as he was closing the trunk of the car. Lyle told the officers that

6

he was legally permitted to carry a gravity knife because he was a member of the stagehands union and used the knife to perform his job. Lyle initially said he had not driven the car but when the officers informed him that they had seen him driving it, Lyle admitted as much. When asked for identification, Lyle produced a New York State ID with the expiration date scratched off. The officers confirmed that Lyle's driver's license was suspended. The officers also determined that the vehicle Lyle was driving was a rental car and that Lyle was not an authorized driver under the rental agreement. Lyle claimed that his girlfriend had rented the car and had given him permission to drive it. The officers arrested Lyle for driving with a suspended license and for possessing an illegal knife.

Before heading to the station for processing, Lyle asked if the car could be left at the location and stated that his girlfriend would pick it up. The officers denied the request and impounded the vehicle. At the police precinct, an inventory search was conducted. Over one pound of methamphetamine and approximately $39,000 cash were found in the trunk of the car.

The following day -- December 12, 2013 -- Lyle was brought to the District Attorney's Office where he made certain statements in custody after

7

being read his *Miranda* rights.  When asked about the methamphetamine that was in the trunk of the rental car, Lyle stated that "an individual . . . had contacted him and asked him to hold something for him."  Tr. 435.[1]  He stated that upon meeting with that individual and another individual, he stayed in the car and did not see what was placed in the trunk but presumed it to be drugs because the individual that he was meeting with was known to distribute large quantities of methamphetamine in the New York area.  When asked about his relationship with these two individuals, Lyle stated that he was friends with them, and had eventually begun working with one of them in delivering methamphetamine to the individual's customers.

Lyle stated that the person in charge had a source of supply in Arizona named either Brendan or Brandon.  Lyle also "provided a few names" of other people in the New York area who distributed large quantities of methamphetamine.  Tr. 436.

On January 9, 2014, police in East Windsor, New Jersey responded to an anonymous call that people were using methamphetamine in a hotel room.  When they got to the hotel room, Lyle opened the door and invited the officers

---

[1] Lyle identified this individual as Van Praagh, but at trial, "individual" was substituted for Van Praagh's name pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).

inside. The officers heard the toilet flush and saw Lyle's girlfriend come out of the bathroom. The officers observed a torch lighter on the bathroom shelf, a small clear bag next to the trash can, and a partial clear straw wrapper containing white residue on the bathroom floor. Additionally, they observed a towel under the bathroom doorway. In the bedroom, the officers noticed that a clear bag had been affixed to the smoke detector with rubber bands.

Officers then performed a consent search of the room, and found approximately fourteen grams of methamphetamine, $3,270 cash, a digital scale, and numerous plastic baggies. Lyle and his girlfriend were both arrested.

## II.    *The Proceedings Below*

### A.    *The Indictment and Van Praagh's Arrest*

Van Praagh, Lyle, and Tarantino were indicted on March 20, 2014. On March 31, 2014, Drug Enforcement Administration ("DEA") agents arrested Van Praagh at his apartment. After receiving consent to search the apartment, agents found tools used to sell drugs, including a heat-sealer, packaging materials, and multiple scales, and a note from Hodges asking Van Praagh to have Lyle call him.

9

On April 6, 2013 Van Praagh called his father from jail and told him, in a recorded call, "they got nothing . . . . I sterilized the house like I told you." Supp. App. 104. He also told him, "[t]hey got Anthony [Tarantino], but I'm expecting that he'll be disappearing any day now . . . . I believe that he had been talking." Supp. App. 105.

### B. *Lyle's Proffer Session*

On April 7, 2014, Lyle participated in a proffer session with the government in hope of reaching a cooperation agreement. A proffer agreement was executed, stipulating that the government would not use any of Lyle's statements made during the proffer sessions against him, except "to rebut any evidence or arguments offered by or on behalf of [Lyle]." Lyle App. 36.

During the proffer session, Lyle admitted that (1) around 2011 or 2012, he sometimes stayed with Van Praagh while working on projects in New York City; (2) he observed Van Praagh smoking and using methamphetamine; (3) he occasionally delivered packages to Van Praagh's clients; (4) he accompanied Van Praagh to deliver methamphetamine thirty to fifty times; (5) Van Praagh told Lyle his supplier was in Arizona; and (6) on one occasion,

Lyle accompanied Van Praagh to pick up methamphetamine from a library in New York City.

### C.    *The Superseding Indictment and Pretrial Motions*

A superseding indictment was filed September 30, 2014, charging (1) Van Praagh and Lyle with conspiring to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), from December 2012 to January 2014; (2) Van Praagh with distributing and possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), on or about May 30, 2013; and (3) Lyle with distributing and possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), on or about December 11, 2013.

Before trial, Lyle moved to suppress the physical evidence recovered from the search of the automobile, as well as his subsequent post-arrest statements.  In an affidavit filed in support of the motion, Lyle admitted that (1) just prior to his arrest, he had been driving the car that had been rented by his girlfriend with her permission; (2) he possessed a gravity knife that day; (3) he

11

initially told the police officers he had not been driving the car but later admitted to driving the car; and (4) his license was suspended at the time.

On September 11, 2014, the district court held an evidentiary hearing on the voluntariness of Lyle's post-arrest statements and, on October 1, 2014, the court denied Lyle's motion to suppress. The court found there was probable cause for Lyle's arrest, based on his possession of a gravity knife. The court then concluded that the search of the rental car was justified on two independent bases. First, Lyle had no reasonable expectation of privacy in the rental car because he was not an authorized driver under the rental agreement. Second, the search of the rental car was a valid inventory search. The court also found that Lyle's post-arrest statements were made voluntarily and pursuant to a valid *Miranda* waiver.

D. *The Trial*

Lyle and Van Praagh's trial began on October 14, 2014, and ended on October 20, 2014. The government called nineteen witnesses, and introduced physical evidence consisting of drugs and drug processing materials, text messages between the defendants, testimony regarding Lyle's post-arrest and proffer statements, and the recorded call Van Praagh made to his father while

12

incarcerated. Van Praagh called one witness who testified about the circumstances of Van Praagh's March 31, 2014 arrest. Lyle did not put on a case.

During his opening statement, Lyle's counsel stated that "[Lyle] obtained, bought, borrowed, was given methamphetamine for his own use. Where we dispute is the idea that he was a dealer." Tr. 28. Later that day, the government submitted a letter brief, asserting that Lyle's counsel's argument that Lyle was not a dealer opened the door to Lyle's proffer statements about distributing drugs with Van Praagh.

Lyle's statements to law enforcement were admitted in two contexts. First, the district court allowed testimony regarding Lyle's December 12, 2013 post-arrest statements to law enforcement to be admitted only as against him, prohibiting mention of Van Praagh. Van Praagh did not object to the redacted testimony. Government witnesses testified that Lyle admitted that an "individual" for whom he worked as a "runner" "asked him to hold something for him" in the trunk of the rental car, which Lyle "presumed . . . to be drugs" because Lyle knew "[t]hat individual along with another individual" distributed "large quantities of crystal meth in the New York area." Tr. 435, 534. Lyle was friends "[m]ore so with the individual that had not placed the drugs in the trunk.

13

. . . He said that he began as friends, and eventually he began working with that individual" -- the "individual who was in charge"-- "assisting him in delivering . . . methamphetamine to that individual's customers." Tr. 435-36. Lyle told law enforcement that the individuals for whom he was working as a runner had a source of supply in Arizona named either Brendan or Brandon. Lyle also gave law enforcement "a few names" of other people in the New York area who distributed methamphetamine, including the names of three competitor drug dealers. Tr. 436. On cross-examination, Lyle's attorney elicited testimony that, during the post-arrest interview, Lyle "gave names of people during the conversation," one of which was Brandon or Brendan. Tr. 448.

Second, toward the close of the government's case, the district court ruled -- over Lyle's objection -- that Lyle's proffer statements were admissible, but again prohibited mention of Van Praagh. Van Praagh did not object. The government witness then testified that Lyle admitted he had "first become involved in methamphetamine" in 2012 through "someone" he "knew . . . from work." Tr. 517-18. Lyle observed "that person . . . using and distributing crystal methamphetamine." Tr. 518. Lyle "began distributing small packages" for that person and "accompanying that person on deals as well as picking up crystal

14

methamphetamine." *Id.* Lyle admitted that "he accompanied this person . . . [on] between 30 to 50 occasions. And that at one point they had gone to a library in the New York City area . . . to pick up crystal methamphetamine." *Id.* Lyle said the methamphetamine supplier was in Arizona.

On cross-examination, Lyle's attorney elicited from the witness that "[Lyle] actually g[a]ve real names of people" during his proffer session, and provided "some names of people whose last names he didn't know." Tr. 524. These names included "Zaron," "Ted," "Bob," and "Joe." Tr. at 525.

At the close of trial, the district court instructed the jury, in pertinent part: "There has been evidence that Mr. Lyle made statements to law enforcement authorities . . . . I want to let you know that . . . Mr. Lyle's statement about his own conduct may not be considered or discussed by you with regard to Mr. Van Praagh." Tr. 713.

On October 20, 2014, the jury found the defendants guilty on all counts. On March 25, 2015, the district court sentenced Lyle principally to the statutory mandatory minimum of 120 months' imprisonment and, on April 2, 2015, the district court sentenced Van Praagh principally to 144 months' imprisonment. In imposing a higher sentence on Van Praagh, the district court

15

concluded that "Van Praagh had a higher role, more important role. He dealt in more drugs than did Mr. Lyle." Van Praagh App. 62.

These appeals followed.

## *DISCUSSION*

Six issues are presented: (1) whether Lyle had a reasonable expectation of privacy in the rental car; (2) the interpretation of Lyle's proffer agreement; (3) the sufficiency of the redactions to Lyle's proffer statements; (4) the admissibility of Lyle's New Jersey arrest; (5) the sufficiency of the conspiracy evidence against Van Praagh; and (6) the reasonableness of Van Praagh's sentence. We address each issue in turn.

## I.   *Reasonable Expectation of Privacy in Rental Car*

We review a district court's ruling on a suppression motion for clear error as to factual findings, "giving special deference to findings that are based on determinations of witness credibility," and *de novo* as to questions of law. *United States v. Hussain*, 835 F.3d 307, 312-13 (2d Cir. 2016) (quoting *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009)). We conclude that Lyle's motion was properly denied. Because we find that Lyle had no reasonable expectation of

16

privacy in the rental car, we do not need to address the legality of the inventory search.

### A.    *Applicable Law*

The Fourth Amendment guarantees citizens the "right . . . to be secure in their . . . effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To prove that a search violated the Fourth Amendment, "an accused must show that he had a legitimate expectation of privacy in a searched place or item."  *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).  The person challenging the search must demonstrate a subjective expectation of privacy in the place searched, and that expectation must be objectively reasonable.  *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988).

We have not addressed the question of whether an unauthorized driver of a rental car has a reasonable expectation of privacy in the car.  This question has divided the various circuit courts, resulting in at least three responses.

The majority of circuits that have considered this question have concluded that an unauthorized driver of a rental car lacks a legitimate

17

expectation of privacy in the car absent extraordinary circumstances. *See United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011) ("[A]s a general rule, the driver of a rental car who has been [l]ent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy."); *United States v. Seeley*, 331 F.3d 471, 472 (5th Cir. 2003) (per curiam) (finding no plain error in district court's holding that defendant "lacked standing to challenge the search of the rental car, as he (the sole occupant of the car) was not the renter or an authorized driver" (citing *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990))); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) ("[A]ppellant, as an unauthorized driver of the rented car, had no legitimate privacy interest in the car and, therefore, the search of which he complains cannot have violated his Fourth Amendment rights."); *United States v. Obregon*, 748 F.2d 1371, 1373, 1375 (10th Cir. 1984) (holding that district court was not "clearly erroneous in finding that [defendant] did not have a legitimate expectation of privacy in the [rental] car he was driving," where defendant's name was not on car rental contract).

The Sixth Circuit has taken a slightly different -- more fact-based -- approach. It has acknowledged "that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle," but it has refused "to adopt a bright line test . . . based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver." *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001). Rather, the Sixth Circuit considers whether the unauthorized driver "had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances." *Id.* at 586. In *Smith*, the court concluded that the unauthorized driver of a rental car had a legitimate expectation of privacy in a rented vehicle because (1) he was married to authorized driver, (2) had the renter's permission to use the car, (3) was himself a licensed driver, (4) "was able to present the rental agreement and provided the officer with sufficient information regarding the vehicle," and (5) had himself paid for the rental car. *Id.*

Finally, the Eighth and Ninth Circuits have held that an unauthorized driver has a reasonable expectation of privacy in a rental car if the authorized driver gave him or her permission to use the car. *United States v.*

19

*Thomas*, 447 F.3d 1191, 1198-99 (9th Cir. 2006) ("[W]e cannot base constitutional standing entirely on a rental agreement to which the unauthorized driver was not a party and may not capture the nature of the unauthorized driver's use of the car. Rather, an unauthorized driver who received permission to use a rental car and has joint authority over the car may challenge the search to the same extent as the authorized renter." (internal citation omitted)); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) ("If [authorized driver] had granted [unauthorized driver] permission to use the [rented] automobile, [unauthorized driver] would have a privacy interest giving rise to standing.").

## B. *Application*

We do not need to reach the question of whether an unauthorized driver of a rental car ever has a reasonable expectation of privacy in the car, because Lyle was not just an unauthorized driver, but an unlicensed one. Accordingly, Lyle's use of the rental car was both unauthorized *and* unlawful. *See* N.Y. Vehicle & Traffic Law § 511 (prohibiting operating a car without a valid license). Lyle should not have been driving any car because his license was suspended, and a rental company with knowledge of the relevant facts certainly would not have given him permission to drive its car nor allowed a renter to do

so.  Under these circumstances, Lyle did not have a reasonable expectation of privacy in the rental car.  *See United States v. Haywood*, 324 F.3d 514, 516 (7th Cir. 2003) (declining to resolve circuit split over whether unauthorized driver had reasonable expectation of privacy in rental car, because unauthorized driver also had suspended license and the combination resulted in no reasonable expectation of privacy); *cf. United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995) ("[W]e think it obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car."); *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) ("To mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner.").

Our decision in *United States v. Smith*, 621 F.2d 483 (2d Cir. 1980), is instructive.  There, we held that Smith had no legitimate expectation of privacy in the trunk of a rental car, despite the fact that he was in the driver's seat of the car when he was stopped by law enforcement.  *Id.* at 485, 487.  Like Lyle, Smith "had no driver's license and the car was registered in another's name." *Id.* at 487.  Also like Lyle, Smith "made no showing that he had any legitimate basis for being in the car at all." *Id.*

Lyle's reliance on the Sixth Circuit's decision in *Smith*, 263 F.3d at 586, is misplaced. *Smith* presented unique facts. Specifically, Smith was not only the husband of the renter, but he also "had a business relationship with the rental company" because he had "called the rental company to reserve the rental vehicle," "was given a reservation number," and "provided the company with his credit card number, and that credit card was subsequently billed for the rental of the vehicle." *Id.* In light of these facts, the Sixth Circuit determined that "Smith was the *de facto* renter of the vehicle" and that, therefore, he had a legitimate expectation of privacy in the rental car. *Id.* at 586-87. Lyle was not the *de facto* renter of the car at issue here. Moreover, the Sixth Circuit also noted that Smith was a licensed driver. *Id.* at 586 ("Smith was a licensed driver . . . . Therefore, it was not illegal for Smith [to] drive the vehicle."). For these reasons, *Smith* is distinguishable.

Accordingly, Lyle lacked a reasonable expectation of privacy in the rental car, and the district court did not err in denying his motion to suppress.

**II.**     *The Proffer Agreement Waiver*

We review the district court's interpretation of the scope of a proffer

agreement waiver *de novo* and its evidentiary rulings for abuse of discretion.

*Rosemond*, 841 F.3d at 107.

**A.     Applicable Law**

Ordinarily, a "statement made during plea discussions with an

attorney for the prosecuting authority" that does not result in a guilty plea is not

admissible against the defendant who made the statement.  Fed. R. Evid.

410(a)(4).  The protections provided by Rule 410, however, can be waived,

including in a proffer agreement with the government, provided that such

waiver is knowing and voluntary.  *Rosemond*, 841 F.3d at 107; *United States v.*

*Velez*, 354 F.3d 190, 194-95 (2d Cir. 2004).

To determine whether a proffer agreement's waiver provision

applies, we ask first whether the defendant has offered any evidence or made a

factual assertion that would trigger the Rule 410 waiver, and, "if so, whether the

proffer statement 'fairly rebut[s]' the fact asserted or evidence offered or elicited."

*Rosemond*, 841 F.3d at 107.  If the waiver has been triggered and the proffer

23

statement properly rebuts the assertion triggering the waiver, the government

may offer the proffer statement. *Id.*

In *Rosemond*, we gave examples of factual assertions that will trigger

the proffer waiver, including "asserting, in an opening statement, that someone

other than the defendant was the real perpetrator of the crime," *id.* at 109 (citing

*United States v. Barrow*, 400 F.3d 109, 114, 119 (2d Cir. 2005)), and "arguing that a

shooting was 'an intended kidnapping gone wrong,' when the defendant

admitted in a proffer session that the shooting was 'an intentional murder,'" *id.* at

110 (quoting *United States v. Gomez*, 210 F. Supp. 2d 465, 472 (S.D.N.Y. 2002)).

## B. *Application*

The district court properly held that the waiver was triggered by

Lyle's counsel's statement during opening argument that "we dispute [] the idea

that [Lyle] was a dealer." Tr. 28. Lyle's proffer agreement contained a waiver

that allowed his statements to come in "to rebut any evidence or arguments

offered by or on behalf of [Lyle]." Lyle App. 36.

As this Court has recognized, a defense argument does not trigger a

waiver if it "simply challenge[s] the sufficiency of government proof on [the]

elements." *Barrow*, 400 F.3d at 119. But "a statement of fact in a defense opening,

such as [a] statement . . . unequivocally identifying [someone other than

24

defendant] as the real perpetrator of the charged crimes," is a factual assertion that would trigger a waiver provision. *Id.* Here, defense counsel did not ascribe the charged crime to someone else, but he did more than challenge the sufficiency of the government's proof. Rather than argue that the government would not adduce credible evidence that Lyle was a drug dealer, counsel disputed the very idea that Lyle was a dealer. This is the functional equivalent of an affirmative statement that Lyle, in fact, did not deal methamphetamine. This assertion was belied by Lyle's proffer admissions and, thus, triggered the waiver provision in the proffer agreement.

Lyle's proffer statements fairly rebut his counsel's opening argument that Lyle was not a dealer. The proffer statements at issue included that (1) Lyle repeatedly distributed "small packages" of methamphetamine; (2) Lyle accompanied another person to obtain and deliver methamphetamine; and (3) Lyle knew the location of the methamphetamine supplier. Taken together, these statements imply participation in a drug distribution operation and thus fairly rebut Lyle's counsel's argument in his opening statement that Lyle was a mere user of methamphetamine and not a dealer. *See Barrow*, 400 F.3d at 120-21 (emphasizing that "proper rebuttal is not limited to direct contradiction" but

"encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary").

Hence, we conclude that the district court did not abuse its discretion in admitting Lyle's proffer statements.

**III.** ***The Admission of Lyle's Redacted Statements***

*A.* ***Applicable Law***

In *Bruton v. United States*, 391 U.S. 123, 135-36 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession naming the defendant as a perpetrator at their joint trial violates the latter's Sixth Amendment right to cross-examination.  The Court later made clear that a non-obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any *Bruton* problem.  *See Gray v. Maryland*, 523 U.S. 185, 195-97 (1998); *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987).

We have consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate *Bruton*.  *See, e.g., United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009) (noting that operative questions when evaluating *Bruton* claim are "(1) did

26

the redacted statement give any indication to the jury that the original statement contained actual names, and (2) did the statement standing alone otherwise connect co-defendants to the crimes" (internal quotation marks and ellipsis omitted)). In *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), for example, we affirmed a conviction based in part on a co-defendant's statement that was redacted to reference "others," "other people," and "another person." *Id.* at 1135.

To determine whether a redaction is sufficient under *Bruton*, we view the redacted statement separate and apart from any other evidence admitted at trial. *Id.* (citing *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985)); *see also United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991) ("[T]he appropriate analysis to be used when applying the *Bruton* rule requires that we view the redacted confession in isolation from the other evidence introduced at trial. If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").

**B.    *Application***

Van Praagh contends that his constitutional rights were violated by the admission of Lyle's redacted proffer and post-arrest statements. We

ordinarily review evidentiary rulings for abuse of discretion; however, Van Praagh did not object to the introduction of the redacted statements at trial, and so we review the admission of this evidence for plain error. *See United States v. Pierce*, 785 F.3d 832, 840 (2d Cir.), *cert. denied*, 136 S. Ct. 172 (2015).[2]

The redacted statements did not violate *Bruton*. The neutral terms "individual" and "person," which were substituted for proper names with the exception of that of a supplier -- "Brendan or Brandon," Tr. 436, 534 -- were not so obvious as to indicate to the jury that the original statements contained actual names. This was an ongoing criminal enterprise where many people were involved and the government introduced evidence of methamphetamine dealing by several people. Thus, the substitutions alone did not necessarily identify Van Praagh. Further, Lyle's redacted statements sounded sufficiently natural. For instance, he admitted that he had "first become involved in methamphetamine" through "someone" he "knew . . . from work," Tr. 517-18, and that the individual for whom he worked as a "runner" "asked him to hold something for him" in the

_____

[2] Van Praagh contends that his *Bruton* argument was preserved by his counsel's objection to the admission of Lyle's unredacted statements and by Lyle's counsel's objection to the redacted statements. Admission of unredacted statements, however, is a different and independent issue, and Van Praagh cites no authority suggesting that one party's counsel may preserve another party's claim of error when the other party's counsel fails timely to join in the objection. Accordingly, plain error review applies.

trunk of the rental car. Tr. 435, 534. Because such statements "might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate," they do not violate *Bruton*. *Jass*, 569 F.3d at 62. Nor did the redacted statements, viewed in isolation, contain any information indicating that Van Praagh was the "individual" in question, let alone information that would "immediately inculpate" him. *Id.* at 61 (internal quotation marks omitted).

Van Praagh relies on *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014), to support his contention that the redactions violated *Bruton*, but *Taylor* is distinguishable. *Taylor* involved a *single* robbery of a drug store by four people. *Id.* at 20-21. One of the four, Luana Miller, became a cooperating witness, and another, Curtis Taylor, gave post-arrest confessions. *Id.* At the trial of Taylor and the two other co-defendants, the trial court admitted Taylor's post-arrest confessions but required their redaction to omit identifications of his two co-defendants. In the portions of the confessions that were admitted, Miller's name was mentioned but the names of the two co-defendants were replaced with "two other individuals," "the person," and "the driver." *Id.* at 29. We determined that in this circumstance the redactions were so obvious as to violate *Bruton*. Our

29

reasoning was as follows. First, Miller's name was used throughout and, "[i]f Taylor had been trying to avoid naming his confederates, he would not have identified one of them -- Miller -- in the very phrase in which the names of the other confederates are omitted." *Id.* Second, the wording of the redacted statements, *i.e.*, "[t]he robbery was the idea of the person who waited with Luana Miller and Taylor at the gas station," was stilted and unnatural. *Id.* Third, in this context, the "reference to 'two other individuals' [was] suspiciously closer to the speech of a prosecutor than that of a perpetrator." *Id.* On the basis of these factors, we determined that it was obvious that names had been omitted from the statements and, therefore, "the choice of implied identity [was] narrow. The unnamed persons correspond[ed] by number (two) and by role to the pair of co-defendants . . . [and] [t]he jury could immediately infer, on the evidence of the redacted confession alone, that Taylor had likely named the co-defendants." *Id.*

This case is unlike *Taylor*. First, Lyle's statements referred to *multiple* people -- not only one unnamed person to correspond to the one co-defendant, Van Praagh. This did not present the necessary process-of-elimination problem that left the jury's "choice of implied identity narrow" as in *Taylor*. *Id.* Second, in addition to Van Praagh's methamphetamine dealing, the government introduced

30

evidence of methamphetamine dealing by its two cooperating witnesses --

Tarantino and Hodges -- as well as several others. Because Lyle's statements did

not reference by name those cooperating witnesses, the jury could reasonably

have inferred that *they* were the "other persons" Lyle was referring to in his

redacted statements. Third, Lyle's statements referred to people involved in a

conspiracy to engage in *ongoing* criminal conduct, not a single criminal act like in

*Taylor*. For all of these reasons, *Taylor* is inapposite.

We also note that the district court here gave a limiting instruction.

*See Taylor*, 745 F.3d at 28 ("It matters that the district court gave limiting

instructions" because "[w]e normally assume that jurors follow limiting

instructions"). The district court specifically instructed the jury that "Lyle's

statement about his own conduct may not be considered or discussed by you

with regard to Mr. Van Praagh." Tr. 713.

Finally, Van Praagh's constitutional rights were not violated by

Lyle's counsel eliciting testimony on cross-examination that his client's

statements had been redacted for presentation at trial and that his client had

indeed provided actual names in his proffer and post-arrest statements. Again,

because Van Praagh did not object during Lyle's attorney's cross-examination,

31

we review for plain error.  In urging error, Van Praagh relies on *Gray v. Maryland*, 523 U.S. 185 (holding that "considered as a class, redactions that . . . notify the jury that a name has been deleted" violated the Confrontation Clause).  But *Gray*'s focus was on the inadequacy of the government's redaction.  Van Praagh can point to no case plainly identifying *Bruton* error when a defendant, whose post-arrest statements are being offered against him, elicits the fact of redaction, or elicits parts of the redacted statement.

Van Praagh fails to show plain error here.  First, his case is distinguishable from *Gray* in that, there, the redaction inadequacy was attributable to the prosecution.  In any event, Van Praagh cannot satisfy the prejudice prong of plain error because in his case the redacted statements referred to multiple "individuals," which means the revelation could not have been immediately inculpatory.  *See Jass*, 569 F.3d at 61.

Further, during cross-examination, Lyle's attorney elicited from the same witness several of the names that Lyle mentioned during his post-arrest and proffer statements, including "Zaron," "Ted," "Bob," and "Joe."  Tr. 525.  In our view, that testimony made it *less*, not more, obvious to the jury that Lyle had also mentioned Van Praagh.  Van Praagh's name was not mentioned at all, and

32

Lyle's counsel's elicitation of other names suggested that the "other persons" mentioned were the individuals whose names Lyle's counsel elicited, not Van Praagh. For all of these reasons, the admission of Lyle's redacted statements was not plainly erroneous.

## IV. *Admissibility of Lyle's New Jersey Arrest*

We review a district court's evidentiary rulings for abuse of discretion, which we will find only if the district court "acted arbitrarily and irrationally." *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (quoting *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002)).

### A. *Applicable Law*

Federal Rule of Evidence 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Fed. R. Evid. 404(b). "The Second Circuit's 'inclusionary rule' allows the admission of such evidence 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence.'"

33

*Greer*, 631 F.3d at 614 (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)).

Not all evidence of uncharged misconduct, however, is prohibited by Rule 404(b). Rather,

> [E]vidence of uncharged criminal activity is not considered other crimes evidence . . . if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.

*United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also Inserra*, 34 F.3d at 89 ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

## B. Application

The district court did not abuse its discretion in admitting the evidence seized during the New Jersey arrest in January 2014. First, that evidence was not barred by Rule 404(b) because the arrest "arose out of the same transaction or series of transactions as the charged offense." *Carboni*, 204 F.3d at 44. Specifically, as discussed above, Lyle argued at trial that he was only a methamphetamine user -- not a dealer. The government rebutted that argument

34

with evidence of Lyle's New Jersey arrest. In summation, the government

argued:

> 14 or 15 grams [of methamphetamine] is still many hundreds, if not
> thousands, of dollars of meth. . . . Also, you know what else was in
> that room? A dozen baggies, a scale, $3,000 in cash. He was not
> weighing out meth for his own personal use. That was meth he was
> going to sell.

Tr. 629. In other words, the evidence seized pursuant to the New Jersey arrest

was not evidence of *other* crimes; it was evidence of the very crime charged in

count one of the indictment, a conspiracy involving Lyle, Van Praagh, and others

to distribute methamphetamine from in or about December 2012 through in or

about January 2014. Accordingly, evidence of the New Jersey arrest was

admissible as direct proof of the methamphetamine distribution conspiracy.

Second, and in any event, the evidence of the New Jersey arrest fits

within the Rule 404(b) inclusionary rule because it shows Lyle's knowledge and

intent regarding the contents of the rental car. Because Lyle argued throughout

trial that he did not know what was in the trunk of the rental car, his knowledge

and intent were at issue. *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990)

("When the defendant disavows awareness that a crime was being perpetrated,

and the government bears the burden of proving the defendant's knowing

possession as an element of the crime, knowledge is properly put in issue.").  The

fact that Lyle was in possession of 14-15 grams of methamphetamine and tools of

the drug trade less than a month after he was arrested with the rental car is

probative of his knowledge and intent regarding the contents of the rental car.  In

addition, the probative value of this evidence was not "substantially outweighed"

by the risk of unfair prejudice as it "did not involve conduct any more

sensational or disturbing than the crimes with which [Lyle was] charged."  *United*

*States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-*

*Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).  Accordingly, the district court acted

well within its discretion in finding that the probative value of the evidence

outweighed the threat of unfair prejudice.

**V.**     *Sufficiency of the Conspiracy Evidence*

We review Van Praagh's challenge to whether the evidence was

sufficient to support his conspiracy conviction *de novo*, "view[ing] the evidence in

the light most favorable to the government, crediting every inference that could

have been drawn in the government's favor, and deferring to the jury's

assessment of witness credibility and its assessment of the weight of the

evidence."  *Rosemond*, 841 F.3d at 113 (quoting *United States v. Coplan*, 703 F.3d 46,

62 (2d Cir. 2012)).  We must affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016)).

The crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal.  *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("To prove a conspiracy, the evidence must show that 'two or more persons agreed to participate in a joint venture intended to commit an unlawful act.'" (quoting *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997))).  We have recognized a "narrow exception" to the conspiracy rule for a transaction between a buyer and seller of drugs.  *Id.*  Under this exception, "the existence of a buyer-seller relationship does not *itself* establish a conspiracy; however, where there is additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction, the evidence may support a finding that the parties intentionally participated in a conspiracy." *United States v. Hawkins*, 547 F.3d 66, 72 (2d Cir. 2008); *see also United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) ("[T]he exception does not protect either the seller or buyer from a charge that they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance

37

other transfers, whether by the seller or by the buyer." (alteration and internal quotation marks omitted)). The question thus becomes "whether the evidence in its totality suffices to permit a jury to find beyond a reasonable doubt that the defendant was not merely a buyer or seller of narcotics, but rather that the defendant knowingly and intentionally participated in the narcotics-distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere purchase or sale." *Hawkins*, 547 F.3d at 73-74.

Van Praagh did not request a buyer-seller instruction at trial and so we review for plain error. *Pierce*, 785 F.3d at 840. The district court did not plainly err in failing to give a buyer-seller instruction because the government presented ample evidence of a narcotics conspiracy beyond a buyer-seller relationship between Van Praagh and Lyle.

First, Van Praagh sold methamphetamine not just to Lyle, but to others. Indeed, he received weekly shipments of methamphetamine, which he then sold to others. With assistance from Tarantino, he regularly sold methamphetamine out of his apartment in Queens as well as out of hotels, and he made deliveries to "[p]robably 50" customers. Tr. 124.

38

Second, the quantity of drugs was consistent with a drug trafficking operation. Tarantino testified that Lyle repeatedly purchased pound-level quantities of methamphetamine at $19,000 to $25,000 per pound. *See United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001) (noting that repeat sales suggest "more than a transient relationship," but are "by themselves" insufficient to support an inference of a conspiracy between the supplier and purchaser); *see also United States v. Murray*, 618 F.2d 892, 902 (2d Cir. 1980) ("[O]ne who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation." (quoting *United States v. Magnano*, 543 F.2d 431, 433-34 (2d Cir. 1976)).

Accordingly, the district court did not plainly err in failing to *sua sponte* give a buyer-seller instruction. *See United States v. Medina*, 944 F.2d 60, 65-66 (2d Cir. 1991) (holding that the district court was not required to give a buyer-seller instruction "where . . . there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use" because "[u]nder such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy").

## VI.  *Reasonableness of Van Praagh's Sentence*

We review the substantive reasonableness of a sentence under a "deferential abuse-of-discretion standard."  *United States v. Aldeen*, 792 F.3d 247, 251 (2d Cir. 2015) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)).  The question is whether Van Praagh's below-Guidelines sentence of 144 months' imprisonment "shock[s] the conscience," constitutes a "manifest injustice," or is otherwise substantively unreasonable.  *Id.* at 255 (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009)); *see also United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011) (per curiam) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.  It is therefore difficult to find that a below-Guidelines sentence is unreasonable." (internal quotation marks and citation omitted)).

Van Praagh's below-Guidelines sentence of 144 months was substantively reasonable.  The district court fully explained its reasoning.  It considered Van Praagh's "very unhappy upbringing," and the "very positive change" that Van Praagh "seem[ed] to be undergoing."  Van Praagh App. 58-59.  The district court determined, however, that a 144-month sentence was sufficient

40

but not greater than necessary because Van Praagh (1) had committed a "very serious" crime; (2) had a "long history of drug dealing" and "plenty of opportunities to change"; (3) clearly had been "in charge of dealing more drugs at a higher level than [Lyle]"; and (4) had a "prior record suggest[ing] that he still continues to be a danger to the community." *Id.*

Van Praagh's argument that, like Lyle, he should have been sentenced to the statutory mandatory minimum of 120 months' imprisonment is unavailing. As the district court noted, Van Praagh had a "more important role" than Lyle. *See* Van Praagh App. 62. Van Praagh supplied Lyle with pound quantities of methamphetamine on multiple occasions. Van Praagh had people working for him to make drug deliveries. Moreover, Van Praagh's criminal history was clearly more serious than Lyle's. Although neither man had previously served any jail time for his crimes, Van Praagh's previous convictions included crimes relating to methamphetamine, while Lyle had only a violation for marijuana possession twenty years prior to the instant offense conduct. In these circumstances, we identify no abuse of the district court's sentencing discretion and no merit in Van Praagh's claim that his sentence is substantively unreasonable.

41

*CONCLUSION*

To summarize, we conclude as follows:

1.     Because Lyle was an unlicensed, as well as unauthorized, driver of the rental car, he had no reasonable expectation of privacy in that car, and the district court did not err in denying his motion to suppress.

2.     Lyle's counsel's statement in his opening argument that "we dispute [] the idea that [Lyle] was a dealer," Tr. 28, triggered the waiver in Lyle's proffer agreement, and the proffer statements, taken together, fairly rebutted his counsel's argument that Lyle was a mere user of methamphetamine and not a dealer.

3.     The admission of Lyle's redacted proffer and post-arrest statements in the defendants' joint trial was not plainly erroneous because the statements substituted neutral terms for actual names and had no otherwise identifying information.  Further, the district court did not plainly err in allowing Lyle's counsel, without Van Praagh's objection, to elicit testimony that Lyle's statements had been redacted, that Lyle had provided actual names in his proffer and post-arrest statements, and what several of those names were because those

disclosures did not prejudice Van Praagh and, indeed, made it *less* obvious to the jury that Lyle was referring to Van Praagh in his statements.

4. The district court did not abuse its discretion in admitting the evidence seized during Lyle's New Jersey arrest because (a) it was direct evidence of the conspiracy charged in count one of the superseding indictment, and (b) even if it was not direct evidence, it was not "other crimes evidence" prohibited by Federal Rule of Evidence 404(b) because it showed Lyle's knowledge and intent regarding the contents of the rental car on December 11, 2013.

5. The district court did not plainly err in failing to *sua sponte* give a buyer-seller instruction to the jury because the government presented ample evidence of a narcotics conspiracy.

6. Van Praagh's below-Guidelines sentence of 144 months' imprisonment was substantively reasonable.

Accordingly, the judgments of the district court are **AFFIRMED**.